UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| JEREMY CIOE and SAROM PED, on behalf of themselves and all similarly situated persons,<br><br>    Plaintiffs,<br><br>    v.<br><br>CELLCO PARTNERSHIP, AIRTOUCH CELLULAR, and VERIZON WIRELESS TEXAS, LLC, all d/b/a VERIZON WIRELESS,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>) No. 1:11-cv-1002<br>)<br>) Honorable Maria Valdez<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**DECLARATION OF MARK A. BULGARELLI IN SUPPORT
OF FINAL APPROVAL OF CLASS ACTION SETTLEMENT**

I, Mark A. Bulgarelli, declare as follows:

    1.    I am an attorney, duly licensed to practice law in the State of Illinois and admitted to practice in the Northern District of Illinois in the instant matter, with Progressive Law Group, LLC, and am counsel of record for the Plaintiffs Jeremy Cioe and Sarom Ped ("Plaintiffs" or "Class Representatives") in this action. Furthermore, I have been conditionally appointed as Class Counsel for the Settlement Class in this matter. I have personal knowledge of the facts set forth herein, and, if called as a witness, I could competently testify thereto.

    2.    I make this declaration in support of final approval of the Parties' Class Action Settlement.

    3.    Progressive Law Group, LLC and Robin Potter & Associates, P.C. both have substantial experience litigating wage and hour class and collective actions such as the instant action. Class Counsel have prosecuted and settled multiple class/collective cases with claims under the Fair Labor Standards Act ("FLSA") and state wage and hour laws. (*See* Group Ex. D

to the Motion and Memorandum in Support of Final Approval of the Class Action Settlement, "Firm Resumes").

4. The Settlement of this proceeding was only reached after a comprehensive analysis of the claims, their likelihood of success, and the resulting potential damages and liability. As a result, Class Counsel has undertaken substantial effort to ensure that the Settlement is fair, reasonable, and in the best interest of the Class.

5. In order to engage in the aforementioned comprehensive analysis, and ensure that the Settlement is proper, Class Counsel obtained thousands of pages of discovery from Defendants. These documents include, but are not limited to, training materials provided to Class members by Defendants, internal policies regarding job duties and record keeping, payment policies, documents related to the duties and pay practices unique to Salary Plus employees, documents detailing Defendants bonus and commission programs, materials from an audit by the Department of Labor concerning Defendants payroll practices, job position descriptions, and other documents relating to Defendants' payment of wages. Additionally, Class Counsel received, reviewed, and analyzed the entirety of Defendants' payroll database, which encompassed over 52 million unique lines of coded pay and hour records for Plaintiffs and the Class, detailing each and every payroll entry.

6. Class Counsel have reviewed and analyzed the payroll data for the Plaintiffs, and in conjunction with retained experts, I have personally analyzed the composite payroll data for the entire Class, which encompassed approximately fifty-two million (52,000,000) lines of payroll data. These analyses showed that each of the wage payment practices complained of in this proceeding were uniform and applied to each member of the Class or Subclass. In particular, Defendants use the same process and methodology to calculate overtime adjustments

for each and every Class member, resulting in a uniform misapplication of overtime adjustment calculations. Furthermore, Defendants' use the same payroll system to pay wages, including overtime adjustments, regardless of location, job title, or other factors, resulting in a standardized issue regarding the timing of the payment of overtime adjustments. Likewise, the review of Defendants' payroll data also demonstrated that Plaintiff Ped and each member of the Subclass was subject to the same practice of only being paid half time for each hour of overtime worked rather than time and a half. Finally, Class Counsel comprehensively reviewed the timekeeping policies and practices of Defendants, along with, in collaboration with retained experts, undertaking an analysis of time punch records and revisions to those records, which demonstrated that the application of deductions to time recorded as worked by Class members was subject to a uniform policy applicable to each member of the Class.

7. Using the data produced, and with the assistance of experts in statistics and data computation analysis, Class Counsel was also able to calculate all forms of alleged damages for all Class members.

8. Additionally, Class Counsel was able to perform a detailed analysis of Defendants' alleged defense, that Defendants had actually overpaid Class members. Defendants' payroll records for the Class demonstrated that Defendants applied the same overtime payment policies and procedures to Plaintiffs and the Class members, including at times paying overtime at a rate greater than one and a half times the regular rate of pay and counting hours not actually worked, such as paid time off, into the calculation of overtime adjustments. These policies resulted in Class members being paid at times more for overtime than relevant laws required. As a result, Defendants would argue that they may apply set offs of these overpayments against other underpayments of overtime shown in the analysis of Defendants' payroll records.

9. Class Counsel also undertook detailed legal analyses of federal and state law to prepare for trial and class certification, leverage negotiations, and effect a favorable settlement. Extensive legal research by our team addressed, *inter alia,* questions of law common to the Class and Subclass as a whole, such as whether Defendants' overtime adjustment practices violated the FLSA and the degree of damages of such violations under applicable law; whether Defendants' alleged class-wide defenses are valid under applicable law; whether Defendants' overtime payment practice as to the Subclass fails to constitute permissible fluctuating workweek compensation; and whether Defendants' policies and procedures as to deductions of work time constitute an overtime violation.

10. Thus, prior to participating in settlement conferences to mediate the parties' differences and before a settlement was reached, Class Counsel had a firm and comprehensive understanding of the factual and legal issues in this matter. As a result, the litigation and attendant discovery, and analysis thereof, had progressed to the point where the Parties were able to effectively evaluate the merits of the claims, potential damages, defenses, and the likely course of further litigation.

11. Class Counsel conducted extensive data analysis and preparation not only for the purpose of settlement negotiations, but Class Counsel simultaneously began preparing to brief class certification and for trial.

12. Upon engaging in settlement conferences with the Defendants, Class Counsel was able to provide and communicate with Defendants regarding a comprehensive analysis of liability, damages, and asserted defenses, and to provide class-wide evidence of the same to Defendants, making Class Counsel better able to settle the case on the favorable terms ultimately obtained for the Class. In fact, to drive the point home with Defendants, Class Counsel even

provided Defendants a work up of each and every overtime adjustment paid to Plaintiff Cioe, demonstrating how the overtime adjustment was calculated, how it should have been calculated, the amount he was overpaid or underpaid in each paycheck, and the net damages after accounting for any applicable set offs for overpayments.

13. The above-described exchange is just one example of hundreds of communications between Class Counsel and counsel for Defendants in the course of this litigation. Since filing this action, Class Counsel and Defendants have communicated with each other on numerous occasions, via phone, email, letter, and in person, and at times in a heated manner, to state each party's position, contest each other's theories and allegations, discuss discovery, and otherwise zealously represent their clients.

14. The above-mentioned back and forth between the Parties culminated in two formal settlement conferences before the Honorable Maria Valdez, on July 10, 2012 and August 10, 2012.

15. Between the first and second formal settlement conferences before Judge Valdez, Defendants produced further documents and data to Class Counsel in an attempt to substantiate Defendants' arguments against the damages in question.

16. These formal settlement conferences combined lasted more than ten (10) hours and the Parties only reached the outline for agreement late in the evening during the second settlement conference.

17. Upon reaching a settlement in principal at the August 10, 2012 settlement conference, the Parties then spent more than five additional months further negotiating the terms of the Settlement, and subsequently negotiated additional Settlement terms and language before executing the Settlement on April 15, 2013.

18. Due to the extensive and difficult negotiations described above, the Settlement Agreement was only reached as a result of arm's-length settlement negotiations.

19. The Settlement constitutes a reasonable compromise of a *bona fide* dispute involving multiple contested legal and factual issues. As described above, Defendants believed they had in fact overpaid Class members and set offs for these overpayments absolved them of liability for any underpayments. Additionally, Defendants' argued that many of the practices complained of in this litigation had been the subject of a previous United States Department of Labor audit, which Defendants believed found them to be compliant with relevant laws, including the FLSA. Defendants argued this audit cleared them of liability or at least limited their liability because it supported that their actions were not willful. Furthermore, relevant to Defendants' potential liability to the Subclass members is Department of Labor guidance indicating that fluctuating work week payment practices, like those employed by Defendants, are improper. However, Class Counsel is unaware of any court having adjudicated this issue with respect to the Defendants' practices or application of the guidance in question as presented here, and it remains uncertain whether said guidance will carry any weight in a legal proceeding.

20. Given the contested positions in this proceeding and the presence of an issue of first impression, in my opinion, the Settlement is fair, reasonable and adequate and provides substantial benefits to the Class, particularly when the risks, difficulties, delays and uncertainties inherent in litigation, trial and post-trial proceedings are taken into account.

21. Class Counsel secured a recovery well beyond expectations. The Settlement creates a fund in the amount of Seven-Million Seven-Hundred and Twenty-One Thousand Dollars ($7,721,000.00), which, together with any accrued interest thereon, constitutes the entire Settlement Fund. (*See* Stipulation of Settlement, Doc. #133-1). Said sum of monies will satisfy

the claims of all Class members who filed valid claims, as well as attorneys' fees and costs, enhancement fees to Class Representatives, and any other payments provided for in the Stipulation of Settlement. The average payment to each Class member, according to the Claims Administrator's calculations, will exceed $234.00, a sizeable average recovery relative to the individual claims at issue. In addition, Verizon Wireless has provided assurances that it has ceased its late payment and improper calculation of overtime adjustments, which should provide further benefit on an ongoing basis to the tens of thousands of Class members still employed with Defendants.

22. Class Counsel was also able to negotiate that Defendants will pay, out of pocket, all costs of notice to the Class and settlement and claims administration, thereby further benefiting the Class, as these costs will not come out of the Settlement Fund.

23. Additionally, any amount remaining from the Settlement Fund after the distribution of all payments, which would arise only if a Class member does not timely deposit their check for their payment, will create a *cy pres* trust, with beneficiaries to be the (1) the Center for Urban Economic Development at the University of Illinois, Chicago and (2) the Donald Vial Center for Employment in the Green Economy at the University of California-Berkeley Institute for Research on Labor and Employment. The recipients were designated in the Notice of Pendency of Class Action and Proposed Settlement. (Doc. #133-2). Both organizations are worthy recipients who have attested to the fact that they will use the funds for the purpose of protecting worker rights, or promoting job opportunities, job quality, or workplace fairness, as required by the Settlement Agreement.

24. Class Counsel also went to great length to negotiate a release that is as limited as possible, rather than a general release. The release applicable to the Class and Subclass relate

only to the specific conduct complained of in the litigation and that is the subject of the Settlement, and not to any other potential claims. By contrast, Class Representatives have executed a full general release of all claims known and unknown against the Defendants, and the requested enhancement awards agreed to by Defendants take that additional release into account.

25. Class Counsel used its comprehensive analysis of Defendants' payroll records to develop a formula by which Class member distributions from the Settlement Fund would be calculated. This formula, which is set forth in the Settlement Agreement and Notice, took into account the likely damages and liability resulting from each claim, and distributes Settlement amounts to Class members in proportion to damages allegedly due to them based on the Class member's payroll data. For example, with regard to the late payment of overtime adjustment claim, a Class member's damages resulting from the late payment of overtime adjustments would directly correlate to the amount of overtime adjustments they were in fact paid, therefore the distribution formula provides that the greater the amount of overtime adjustments paid, the greater the Class member's Settlement amount will be. As a result, Class members who worked more and/or were more egregiously underpaid and/or were subject to more late payments, and who arguably merit more damages, receive a greater Settlement amount.

26. As a result, Class Counsel and the Class Representatives support the Settlement.

27. From the inception of this proceeding, the Class Representatives have been thoroughly involved in the prosecution of this matter. Both Class Representatives have spent significant time with Class Counsel going through their payroll records, explaining how Defendants' payroll and time keeping processes work, assisting Class Counsel in calculating potential underpayments of wages and other damages, and otherwise assisting Class Counsel in formulating their understanding of the claims. Additionally, the Class Representatives

personally attended the first settlement conference between the Parties on July 10, 2013 and were involved via telephone, as authorized by the Honorable Maria Valdez, for the second settlement conference of August 10, 2013.

28. Class Representatives continue to work in the retail industry and took significant risks by engaging in this litigation. Without the contributions of the Plaintiffs, this matter would not have been brought and the favorable settlement would not have been achieved.

29. In the course of this proceeding Class Counsel have not found or otherwise become aware of any individual interests or claims of the Class Representatives that are antagonistic to the Class and the Class Representatives have a significant interest in the outcome of this matter as they were both subject to the same wage payment practices as each and every other member of the Class and/or Subclass.

30. Prior to and during litigation, Class Counsel expended substantial effort in investigating the facts of this matter, researching all potential claims and applicable law, and analyzing volumes of payroll data. Throughout the litigation, they have engaged in extensive correspondence, information exchange, and negotiations with Defendants' counsel.

31. Class Counsel has also expended significant effort working with the Claims Administrator to ensure the notice and claims process was executed in the most effective way possible to the greatest benefit possible to Class members. Class Counsel not only drafted the Notice and Claim and Opt-In Forms sent to Class members, but also took numerous other steps related to claims administration, including, but not limited to: (1) developing a settlement website, in conjunction with the Claims Administrator, which provided relevant court documents and information to Class members and allowed Class members to seamlessly file claims online; (2) developed a QR code which was placed on the Notice documents received by Class members

that allowed class members to go to the settlement website by scanning the QR code with their smartphone; and (3) developing call scripts, which provided answers to questions about the Settlement, for the Claims Administrator to use when fielding calls from Class members.

32. Class Counsel also negotiated, with Defendants, for the Claims Administrator to perform a more in-depth skip-tracing process than originally anticipated, resulting in receipt of the Notice by more than five hundred Class members who would otherwise not have received the Notice without this additional step. (*See* Ex. B to the Motion and Memorandum in Support of Final Approval of the Class Action Settlement, "Dahl Decl." ¶16). This consisted of an extra manual follow up review to the skip-trace records, rather than relying solely on the automated results, which resulted in numerous additional mailing addresses for Class members being found. Class Counsel negotiated with Defendants and was able to get Defendants to pay for this extra level of skip-tracing out of Defendants' pocket.

33. Class Counsel has been in contact with the Claims Administrator on an almost daily basis, and has been actively involved in each step of the administration process.

34. In addition to the correspondences from Class members fielded by the Claims Administrator, a number of Class members have directly contacted Class Counsel. I have personally responded to inquiries about the Settlement, or issues related to the Settlement, from more than one hundred (100) Class members. Many of these correspondences from Class members actually resulted in the exchange of multiple phone calls and emails in order to bring about a satisfactory resolution to the Class member's inquiry. Each communication from a Class member to Class Counsel has been promptly responded to. A vast number of the Class members with whom I have spoken have directly expressed overwhelming appreciation for the time and level of attention given to their question or issue, and I have not spoken to a single Class member

who expressed dissatisfaction with the level of service Class Counsel has provided in dealing with these correspondences. Class Counsel will continue to respond to and address any communications from Class members for as long as they continue.

35. This case, like most nationwide complex class action litigation was complicated and time-consuming. Lawyers representing large classes of employees in wage and hour litigation must be prepared to spend significant time, energy and money. Because of the contingent nature of the fee arrangements common in this type of litigation the lawyers must make these investments with the knowledge that they may receive nothing in the way of fees. The risks and resource investments of this type of litigation deter many firms from representing groups with limited individual damages like the Class.

36. Class Counsel executed fee agreements with Plaintiffs entitling Class Counsel to one-third of any recovery, plus reimbursement of out-of-pocket costs. Plaintiffs in this case could not have afforded to retain counsel on any basis other than a contingent fee basis. Despite this, Class Counsel agreed to prosecute the litigation without any fees from Plaintiffs' pockets and to finance all the expenses of litigation out of Class Counsel's pocket as long as required, which presented a significant risk to Class Counsel as Class Counsel would receive nothing if we were not successful.

37. Class Counsel has worked on a contingency basis, incurring all expenses related to the pursuit of the instant action themselves and have not received any compensation for their work to date. Class Counsel covered all the costs, including the considerable expenses related to retained experts, up front and out-of-pocket, without any guarantee of recovery.

38. Class Counsel has incurred $29,076.18 in expenses and costs in the course of prosecuting this proceeding. Such expenses were incidental and necessary to the representation

of Plaintiffs and other Class members, including *inter alia* the cost of employing experts in statistics and data analysis to assist in the analysis of the tens of millions of lines of payroll code produced by Defendants. Retained experts assisted with statistical modeling and damages analysis, and in writing computer programs to analyze the millions of lines of Defendant's payroll data necessary to successfully prosecute this matter.

39. Class Counsel's work in regards to this case is ongoing and will continue well past the date of this filing. For example, Class Counsel will continue to work to make sure settlement distributions and *cy pres* distributions are properly made, and Class Counsel is aware from past experience that calls and inquiries from Class members will continue for months.

40. As explained more fully above, and in Group Ex. D detailing Class Counsel's experience, Class Counsel has considerable experience prosecuting class and employment litigation. In light of the market rate of such services, results achieved, and Class Counsel's already expended significant efforts and anticipated future efforts, the requested percentage of the Settlement Fund is reasonable. Furthermore, the Notice sent to each Class member informed the Class members of Class Counsel's fee and cost request, and only one objection, which is void of any factual support, has been received.

41. The Claims Administrator, Dahl Administration, LLC, has previously confirmed that Verizon Wireless has transferred the full amount of the Settlement Fund to the Claims Administrator; subsequently, both the Claims Administrator and the designated escrow agent in this matter have confirmed that the Settlement Fund has been placed in escrow.

The foregoing is true and correct to the best of my knowledge. Executed this 25th day of October 2013 in Chicago, Illinois.

Respectfully submitted,

/s/ Mark A, Bulgarelli

Mark A, Bulgarelli, Esq.
PROGRESSIVE LAW GROUP, LLC
1 N. LaSalle Street, Suite 2255
Chicago, IL 60602
Tel: 312-787-2717
markb@progressivelaw.com